UNITED STATES DISTRICT COURT ᴹ FILED
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| TAWANA JEAN COOPER | ) | 2016 MAY 17  P 3: 13 |
|  | ) |  |
|  | ) | CLERK US DISTRICT COURT |
| Plaintiff, | ) | ALEXANDRIA, VIRGINIA |
| vs. | ) |  |
|  | ) | VERIFIED COMPLAINT |
| FEDEX GROUND PACKAGE SYSTEM, INC. | ) |  |
|  | ) |  |
| Defendant. | ) | CASE NO. 1:16 CV 547 |
| Serve: | ) | JCC/ TCB |
| CT Corporation System | ) |  |
| 4701 Cox Road, Suite 285 | ) | JURY TRIAL DEMANDED |
| Glen Allen, Virginia 23060 | ) |  |
| Henrico County | ) |  |

## COMPLAINT

COMES NOW Tawana Jean Cooper, Plaintiff/Pro Se ("Plaintiff") and timely files her Complaint against FedEx Ground Package System, Inc. ("Defendant"), and states:

## I.
### NATURE AND PURPOSE

1.     Plaintiff brings this lawsuit due to sex discrimination and retaliation, unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

## II.
### JURISDICTION

2.     This Court has jurisdiction over this action pursuant to Title VII of the Civil Rights Act of 1964 as amended, for employment discrimination.  Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000e(5).  Equitable and other relief are also sought under 42 U.S.C. § 2000e(5)(g).  Jurisdiction is also based on 28 U.S.C. § 1331, 1343 and 42 U.S.C. § 1981 et seq.

3.     All conditions precedent to jurisdiction under 42 U.S.C. § 2000e(5) have occurred:

   a. On or about December 21, 2015, which was within 180 days of the commission of the unlawful employment practices, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Defendant's action

constituted a violation of Title VII of the Civil Rights Act, and also a claim that Defendant wrongfully retaliated against her for her verbal and written complaints of discriminatory treatment.

b.  On or about February 19, 2016, the EEOC issued to Plaintiff a Notice of Right to Sue Letter informing Plaintiff of her rights and remedies under Title VII. (A true and correct copy of this Notice of Right to Sue Letter is attached hereto as Exhibit "A" and is incorporated herein by reference).

c.  This complaint has been timely filed within 90 days of Plaintiff's receipt of the EEOC's Notice of Right to Sue.

## III.
## VENUE

4.      Venue is proper in this Court because the unlawful employment discrimination giving rise to Plaintiff's claims occurred in this District.

## IV.
## PARTIES

5.      At all times relevant hereto, Plaintiff was a natural person and citizen of the United States and a resident of Annandale, Virginia.  Her mailing address is 6920 Braddock Road, #B175, Annandale, Virginia 22003.

6.      At all times relevant hereto, Defendant was a corporation that maintains its principal office and place of business in Pennsylvania at 1000 FedEx Drive, Moon Township, PA 15108, and is incorporated under the laws of the state of Delaware.  Defendant is registered as a foreign corporation with the Virginia Secretary of State.  Its registered agent in Virginia is CT Corporation System located at 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060 in Henrico County.

## V.
## ALLEGATIONS OF FACTS

7.      On or about March 13, 2015, Plaintiff, a female, commenced her first day of part-time employment as a Package Handler with Defendant located at 14900 Stonecraft Center Court, Chantilly, Virginia 20151.

8.      Plaintiff was qualified for her position.

9.    Plaintiff was assigned to work on belt one and in the loading area.

10.    Occasionally, Plaintiff was assigned to work in other areas.

11.    Plaintiff was very proud to be employed with Defendant and absolutely love her job.

12.    During her employment with Defendant, Plaintiff was told by members of Defendant's management team that she had an enthusiastic attitude and that she was easy to work with.

13.    On or about June 24, 2015, while she performed her assigned employment duties on belt one, Demetris (last name unknown), a male co-worker, verbally attacked Plaintiff when Plaintiff solicited the assistance of William (last name unknown), a male co-worker.

14.    Plaintiff had asked William to move an incompatible package so that she could tape it. At that moment, while standing across from Plaintiff and William on the other side of the belt, in a raised voice and with a mean and intimidating look on his face, Demetris said to William not to help Plaintiff. When Demetris made said statement he was not looking at William. He was looking directly at Plaintiff.

15.    While still looking at Plaintiff, Demetris went on to say that it was Plaintiff's job to tape packages on the dock so that said packages would not need to be taped on the belt, but instead Plaintiff just walks right past packages that need to be taped on the dock. Demetris went on to say that if Plaintiff did her job said packages would not need to be taped on the belt.

16.    Demetris' public words, tone of voice, facial expression, and body language made Plaintiff believe that his behavior was purposefully and intentionally hurtful, spiteful, and cruel, and extremely disrespectful and indecorous.

17.    Plaintiff believed that Demetris was belittling her and malevolent with her.

18.    Immediately Plaintiff felt wounded, embarrassed, humiliated, degraded, and furious.

19.    Demetris' attack against Plaintiff was unprovoked by Plaintiff.

20.    Plaintiff gave Demetris absolutely no reason or right to treat her that way.

21.    Plaintiff did not respond to or defend herself against Demetris for his verbal attack.

- 3 -

22. Plaintiff believed and felt that Demetris had created a hostile work environment for her.

23. Plaintiff immediately reported Demetris' said verbal attack to her immediate supervisor, John Crawford ("Supervisor Crawford").

24. Supervisor Crawford responded that if Demetris committed said verbal attack he was wrong.

25. Supervisor Crawford instructed Plaintiff to work on belt two for the remainder of her shift. Plaintiff's shift was due to end in about 10-15 minutes.

26. Moments later, Sort Manager Chris Nicholls ("Sort Manager Nicholls") approached Plaintiff.

27. Sort Manager Nicholls said to Plaintiff that he had spoken with Demetris about the incident and that Demetris had told him that he was only joking around with Plaintiff.

28. Plaintiff recounted in details Demetris' verbal attack against her and stated that said verbal attack was made in public which made her feel even worse.

29. Plaintiff stated to Sort Manager Nicholls that she believed that Demetris was not joking around.

30. Through his words, tone of voice, facial expression, and body language, Sort Manager Nicholls alluded to Plaintiff that he believed that Demetris was simply joking around and that he felt that Plaintiff was behaving like an overreacting female about a male joking around.

31. Sort Manager Nicholls stated that he knew Demetris to be a person that jokes around a lot.

32. This was Plaintiff's second experience with Sort Manager Nicholls defending an alleged wrongful or adverse behavior of a male employee against a female employee, and inferring that it is the female's behavior that is wrongful or mistaken.

33. On or about June 25, 2015, the next day, Plaintiff gave written complaints about Demetris' verbal attack to Supervisor Crawford and Sort Manager Nicholls.

34. Neither Supervisor Crawford nor Sort Manager Nicholls instructed Plaintiff not to return to belt one. Plaintiff was expected to return to work on belt one.

35. Later, Sr. Manager James (last name unknown) informed Plaintiff that he had read her complaint letters and wanted to speak with her in his office about the incident.

36. Plaintiff met with Sr. Manager James and his manager, Mark (last name unknown).

37. Plaintiff recounted in details Demetris' verbal attack against her and that said verbal attack was made in public, and how said verbal attack made her feel.

38. Through his words, tone of voice, facial expression, and body language, Sr. Manager James made it extremely clear to Plaintiff that he, too, believed that she was behaving like a stupid female that was overreacting to a male joking around.

39. Sr. Manager James said to Plaintiff that "now the matter has to go to human resources."

40. Sr. Manager James made said statement twice during his conversation with Plaintiff.

41. In addition, Plaintiff told Sr. Manager James that in the past Demetris and some of his buddies have made degrading comments about women's bodies.

42. Specifically, Plaintiff spoke about an incident in which Demetris and his male buddies talked about how bad and nasty fat women look and that fat women should not be allowed to wear swim suits because they are fat.

43. Plaintiff told Sr. Manager James how uncomfortable these comments made her feel, but that she knew better than to complain out of fear of losing her job. Plaintiff told Sr. Manager James that she really likes her job and that she would like to remain with Defendant.

44. Sarcastically Sr. Manager James responded that he, too, would like to see Plaintiff stay with the company, but that he did not see how that would be possible.

45. At that moment, Sr. Manager James made Plaintiff feel and believe that he was threatening her job because she, a female, had made a complaint against a male co-worker.

46. As a result, after she had completed her shift Plaintiff contacted the FedEx Alert RESPECT hotline to report that Sr. Manager James had just threatened her job because she had made a complaint against a male co-worker.

47.    On or about June 26, 2015 while performing her assigned job duties, Plaintiff was approached by Sr. Security Specialist William Carter ("Sr. Security Specialist Carter") to interview her regarding said complaint.

48.    After Plaintiff recounted the details of her complaint, Sr. Security Specialist Carter told Plaintiff that he does not handle that type of complaint. He told Plaintiff that human resources handles that type of complaint and that he would forward her complaint to human resources.

49.    Sr. Security Specialist Carter tape recorded part of the interview.

50.    Later, while performing her job duties intentionally in an area far away from Demetris, Demetris came to said area and got very close to Plaintiff almost touching her solely to move two light weight packages that Plaintiff could have moved. Working in said area was very unusual for Demetris, and there were other employees available that could have done what he did.

51.    Plaintiff believed that under the circumstances Demetris and management were retaliating against her. At the end of her shift she reported the incident to Supervisor Crawford.

52.    Plaintiff did not receive any feedback regarding her complaint.

53.    On or about June 27, 2015 Demetris waved at Plaintiff as she was approaching belt one.

54.    Plaintiff believed that under the circumstances Demetris was taunting her in retaliation. At the end of her shift she reported the incident to Supervisor Crawford.

55.    Plaintiff did not receive any feedback regarding her complaint.

56.    Plaintiff made written formal complaints to Supervisor Crawford about both incidents.

57.    Plaintiff never received any follow-up to said written formal complaints.

58.    On or about June 30, 2015 Plaintiff was summoned to meet with Human Resources Generalist II Nathanael Ritenour ("HR Nathanael Ritenour") regarding her complaint against Sr. Manager James.

59.    At HR Nathanael Ritenour's request, Plaintiff recounted all incidents that had occurred from June 24, 2015 to June 27, 2015.

- 6 -

60.    HR Nathanael Ritenour transcribed Plaintiff's complaint as she spoke.

61.    During said meeting, Plaintiff also complained that even though all of the managers knew about Demetris' verbal attack against her and that they knew that she believed that Demetris created a hostile work environment for her, not one of the managers assigned her to a different belt or work area, and that she was expected to return to work on belt one the day after said verbal attack.

62.    Sarcastically HR Nathanael Ritenour asked Plaintiff that if she believed that her work environment was hostile why did she return to the belt.  HR Nathanael Ritenour tone of voice and gestures made it very clear to Plaintiff that his presence and concerns were solely to protect Defendant.  He displayed absolutely no concern for Plaintiff's complaints.

63.    Plaintiff responded that it was her job to work on belt one and that she believed that she had to return to said belt or lose her job.

64.    Plaintiff also complained that when she went to work on belt one the day after the attack, Demetris and two of his male buddies, William and AJ, taunted her by making loud noises at her when they saw her on the belt.  Plaintiff stated that William actually came up to her and asked why she was mad.  Plaintiff said that she did not answer William, and instead walked away.  Plaintiff said that William then followed her and asked her said question again.  Plaintiff said that again she ignored William.  Plaintiff told HR Nathanael Ritenour that there should be a recording of said incident because there are cameras on the belts.

65.    HR Nathanael Ritenour asked Plaintiff how did she know that they were making said noises at her.

66.    Plaintiff responded because they did not become loud until they saw her on the belt.

67.    Plaintiff complained to HR Nathanael Ritenour that she believed that management is ignoring her complaints because she is a woman and Demetris is a man.

68.    Plaintiff complained to HR Nathanael Ritenour that she believed that management and Sr. Manager James are retaliating against her for making said complaints against Demetris.

69.    HR Nathanael Ritenour said that he would conduct an investigation.

70.    Later, shortly after she arrived on belt one, William approached Plaintiff and verbally attacked her about her job performance.

71.    In a tone and demeanor that were authoritative and scolding, William commented to Plaintiff about how she was just now arriving to the belt, and asked Plaintiff where had she been, and questioned her about why she is just now arriving to the belt.

72.    Although Plaintiff felt insulted and disrespected, she ignored William and walked past him.

73.    Moments later Plaintiff returned to William and asked him if he were joking with her.

74.    With his tone elevated, William responded for Plaintiff to "shut-up" and leave him alone.

75.    Plaintiff said to William that he was being disrespectful.

76.    William walked away. Plaintiff walked behind William to return to her work area.

77.    William jumped off the belt. As he jumped off the belt, he said something to Plaintiff. Plaintiff did not hear what he said so she asked him what he said.

78.    William shouted again for Plaintiff to shut-up and leave him alone.

79.    Before Plaintiff could respond, Team Leader John Paul intervened, and asked William to stop talking. William kept talking. Plaintiff walked away.

80.    Plaintiff reported said verbal attack to Supervisor Crawford and told him that William's verbal attack created a hostile work environment for her. She asked Supervisor Crawford to review the video from the cameras that are on belt one.

81.    On or about July 01, 2015 Plaintiff gave a written complaint about William's verbal attack to Supervisor Crawford.

82.    On or about July 02, 2015 Plaintiff was summoned to meet with Sr. Security Specialist Carter.

83.    Sr. Security Specialist Carter informed Plaintiff that he was interviewing her for committing workplace violence against William in the incident that had occurred on June 30, 2015 in which Plaintiff had complained that William had verbally attacked her.

84.    Sr. Security Specialist Carter informed Plaintiff that management had done a thorough investigation regarding said incident and that management had concluded that Plaintiff had committed workplace violence against William.

85.    Sr. Security Specialist Carter told Plaintiff that he was confident with management's investigation.

86.    Plaintiff was shocked, and immediately denied that she had committed workplace violence against William.

87.    Sr. Security Specialist Carter showed Plaintiff two videos from the incident.

88.    The videos were visual only. There was no sound.

89.    Sr. Security Specialist Carter pointed to a spot in one of the videos and said to Plaintiff that she had committed workplace violence against William by following William after William had asked Plaintiff to leave him alone.

90.    Plaintiff replied that she was not following William. That she was walking behind William to return to her work area as shown in the video.

91.    On page nine of the employee handbook that Plaintiff received from Defendant during her new employee orientation on or about March 13, 2015, Defendant defines workplace violence:

> "Workplace violence is defined as any behavior that causes a
> state of fear or concern for safety."

92.    Sr. Security Specialist Carter never told Plaintiff that management had made a finding that she had caused a state of fear or concern for William's safety during said interview.

93.    Sr. Security Specialist Carter never told Plaintiff that William had reported that Plaintiff had caused him a state of fear or concern for his safety during said interview.

94.     Sr. Security Specialist Carter never told Plaintiff that William had made a complaint of any kind against her during said interview.

95.     Sr. Security Specialist Carter told Plaintiff that according to said videos there was not enough time for William to verbally attack her as she had alleged.  Yet, Sr. Security Specialist Carter neither could explain nor did he explain why William approached Plaintiff in the first place as clearly shown in said videos.

96.     Sr. Security Specialist Carter partially tape recorded Plaintiff's interview.

97.     After her meeting with Sr. Security Specialist Carter, Plaintiff was suspended with pay by Sort Manager Nicholls for alleged workplace violence against William.

98.     Later, Plaintiff made a complaint against Sr. Security Specialist Carter with the FedEx Alert Line for the unfair and bias, and disrespectful treatment of her.  Said letter is dated July 02, 2015.

99.     On or about July 06, 2015 HR Nathanael Ritenour contacted Plaintiff via telephone regarding her complaint with the FedEx Alert Line on July 02, 2015.

100.    Plaintiff explained to HR Nathanael Ritenour that said complaint was against Sr. Security Specialist Carter.  HR Nathanael Ritenour responded that he would forward Plaintiff's complaint to Sr. Security Specialist Carter's manager.

101.    During said telephone conversation, Plaintiff inquired about the status of the investigation and told HR Nathanael Ritenour that her suspension is retaliation.

102.    HR Nathanael Ritenour responded that he has not completed his investigation.

103.    Plaintiff asked HR Nathanael Ritenour if their conversation is being recorded.  HR Nathanael Ritenour responded no.

104.    Later on the same date, HR Nathanael Ritenour contacted Plaintiff via telephone to ask if she would be available on Wednesday, July 08, 2015 at 1 PM to meet with him, Sr. Security Specialist Carter, and Sr. Security Specialist Carter's manager at the Chantilly office regarding her complaint against Sr. Security Specialist Carter.  Plaintiff responded yes.

105.    After their conversation, Plaintiff sent an email confirmation of said meeting to HR Nathanael Ritenour.

106.    On or about July 07, 2015 HR Nathanael Ritenour sent an email confirmation of said meeting to Plaintiff.   In said email, HR Nathanael Ritenour stated that he would not be attending said meeting.  HR Nathanael Ritenour stated that the attendees would be Plaintiff, Sr. Security Specialist Carter, and Sr. Security Specialist Carter's manager.

107.    On or about July 07, 2015 Plaintiff sent her complaint against Sort Manager Chris Nicholls as an attachment in an email to HR Nathanael Ritenour.

108.    On or about July 07, 2015 Plaintiff sent her complaint against management and Sr. Manager James as an attachment in an email to HR Nathanael Ritenour.

109.    It had occurred to Plaintiff that she had provided verbal complaints of sex discrimination and retaliation against management and Sr. Manager James to HR Nathanael Ritenour on or about June 30, 2015, and not written complaints.

110.    On or about July 08, 2015, Plaintiff timely arrived at Defendant's Chantilly's office location for said scheduled meeting.  She was seated in a conference room.

111.    Moments later a female and a male entered said conference room.  They provided Plaintiff their names and introduced themselves as Security Officers of Defendant.

112.    The female security officer told Plaintiff that the purpose of the meeting was to interview her about her claim of workplace violence committed against her by Demetris on June 24, 2015.

113.    Plaintiff stated that she did not make a claim against Demetris on June 24, 2015 or anytime for workplace violence, and that according to HR Nathanael Ritenour the purpose of said meeting was to address her complaint against Sr. Security Specialist Carter with him and his manager.

114.    The female security officer responded that HR Nathanael Ritenour was mistaken about the meeting.

115.    Plaintiff was visibly upset that said meeting had been changed without affording her prior notice, and she told the female security officer that she did not want to participate.

- 11 -

116.    In response, the female security officer made Plaintiff believe that she had to participate.

117.    Throughout the entire meeting both security officers were hostile and combative with Plaintiff.    They were disrespectful and authoritative with Plaintiff.    They were bullying and intimidating with Plaintiff.  They twisted Plaintiff's words and made statements about the incident that Plaintiff did not make.

118.    The security officers' behaviors were as if Plaintiff was the wrongdoer.

119.    When Plaintiff requested to review the two videos regarding the alleged workplace violence against William, the female security officer responded no; that said matter had been dealt with.

120.    When Plaintiff repeatedly refused to sign a statement form that the female officer requested her to sign, said female officer made Plaintiff believe that she had to sign said form.

121.    The female officer tape recorded part of the interview.

122.    On or about July 17, 2015, Plaintiff sent an email to HR Nathanael Ritenour for a status update.  Plaintiff wanted to know if she had been terminated and so why, and to whom should she appeal.  Plaintiff had not heard from Defendant since July 08, 2015.

123.    HR Nathanael Ritenour responded via email that he had left Plaintiff a voicemail and asked that Plaintiff give him a call.

124.    On or about July 18, 2015, Plaintiff sent an email to HR Nathanael Ritenour to inquire if there was a reason in particular that he refuses to respond to her via email about the investigation.

125.    On or about July 18, 2015, Plaintiff and HR Nathanael Ritenour exchanged additional emails.

126.    On or about August 06, 2015 Plaintiff received an email from HR Nathanael Ritenour.  He asked if she would be available tomorrow.  He stated that "we would like to contact you to discuss the results of the investigations."  Plaintiff responded yes.

127.    On or about August 07, 2015 HR Nathanael Ritenour contacted Plaintiff via telephone.  He informed Plaintiff that the investigations had been completed and that everyone had been disciplined.  He then said that Sr. Manager James needed to speak with me.

128.    Sr. Manager James said "TJ, security did a thorough investigation and workplace violence will not be tolerated. Effective today you are terminated."

129.    When HR Nathanael Ritenour returned to the phone, Plaintiff requested the next step for an appeal. HR Nathanael Ritenour responded that he would email said information to Plaintiff.

130.    Later, HR Nathanael Ritenour emailed said information to Plaintiff.

131.    Plaintiff timely filed a stage one appeal.

132.    On or about August 20, 2015 HR Nathanael Ritenour emailed to Plaintiff information for the stage one respect meeting. Said meeting was scheduled for August 25, 2015 at 3:30 PM via telephone.

133.    On or about August 25, 2015 the stage one respect meeting commenced. The attendees were Plaintiff, Managing Director Richard Kraynak, and HR Nathanael Ritenour.

134.    Before she started her appeal, Plaintiff asked if said meeting would be tape recorded. HR Nathanael Ritenour answered no.

135.    Plaintiff recounted the verbal attack and taunting that Demetris had committed against her, and that Demetris had created a hostile environment for her.

136.    Plaintiff stated that neither Sort Manager Chris Nicholls nor any of the managers including and especially Sr. Manager James did not keep Demetris away from her until the matter calmed down even though they all saw how hurt and livid Demetris' attack had made her feel.

137.    Plaintiff recounted the verbal attack and taunting that William had committed against her, and that William had created a hostile environment for her.

138.    Plaintiff recounted exactly what occurred between her and William in the alleged workplace violence incident that was alleged by management and Sr. Manager James.

139.    Plaintiff stated that she did not commit workplace violence against William and that the video shows that she did not commit workplace violence against William.

- 13 -

140.    Plaintiff read verbatim from her employee handbook that she had in front of her at the time how Defendant defines workplace violence.

141.    Plaintiff then stated that no one has ever told her how walking behind William to return to her work area caused William a state of fear or concern for his safety.

142.    Plaintiff also stated that no one has ever told her that William complained that she had caused him a state of fear or concern for his safety when she walked behind him to return to her work area.

143.    Managing Director Richard Kraynak interrupted Plaintiff and asked her how much longer she was going to be because she has been talking for a while now.

144.    Plaintiff responded that this is her appeal. Then quickly, Plaintiff said that she believed that Sort Manager Chris Nicholls discriminated against her because she is a woman that made a complaint against a male employee; that Sort Manager Chris Nicholls accused her of workplace violence in retaliation for her complaint against Demetris and because she had refused to drop her complaint against Demetris; and that Sr. Manager James terminated her in retaliation.

145.    Plaintiff asked Managing Director Richard Kraynak to spell his name for her.

146.    Managing Director Richard Kraynak responded why.

147.    Plaintiff stated because she has the right to know, and asked Managing Director Richard Kraynak if he were refusing to spell his name for her.

148.    At that very moment, HR Nathanael Ritenour interrupted and stated that Managing Director Richard Kraynak was not refusing to spell his name for Plaintiff.

149.    Managing Director Richard Kraynak then spelled his name for Plaintiff.

150.    From the very beginning of the meeting, Managing Director Richard Kraynak made it very clear to Plaintiff that said meeting was simply a formality and that he had already made his decision.

151.    Managing Director Richard Kraynak stated that he would conduct his own investigation, and that he would inform Plaintiff of his decision in writing.

152.    On or about August 28, 2015 Managing Director Richard Kraynak mailed his decision.

- 14 -

153.    Managing Director Richard Kraynak stated that he had decided to uphold Plaintiff's termination.

154.    Plaintiff timely exhausted all her appeal rights with Defendant.

155.    All of Plaintiff's appeals were denied.  Plaintiff was informed in writing.

156.    Defendant's retaliation that Plaintiff committed workplace violence and her subsequent unlawful termination has made it impossible for Plaintiff to secure employment elsewhere without deceiving potential employers.

157.    Defendant's Equal Employment Opportunity policy is a sham.

## VI.
### Causes of Action

### FIRST CAUSE OF ACTION – SEX DISCRIMINATION IN VIOLATION OF TITLE VII

158.    All allegations set forth in paragraphs 1-157 above are incorporated herein by reference as though fully set out.

159.    As herein alleged, Defendant, by and through its agents and employees, has engaged in intentional gender discrimination in the terms and conditions of Plaintiff's employment, including, but not limited to, Plaintiff's termination.

160.    By virtue of its' actions and inactions as set forth above, Defendant has violated Title VII of the Civil Rights Act of 1964 with regard to Plaintiff by neglecting to protect her from a hostile work environment because of her gender, female, that was caused by and created by two male employees.

161.    As a proximate result of Defendant's unlawful discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.  As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

162. Defendant's unlawful sex discrimination actions were intentional, willful, malicious, and/or done with reckless disregard for Plaintiff's rights.

163. Plaintiff requests relief as described in the Prayer for Relief below.

## SECOND CAUSE OF ACTION – RETALIATION IN VIOLATION OF TITLE VII

164. All allegations set forth in paragraphs 1-163 are incorporated herein by reference as though fully set out.

165. As herein alleged, Defendant, by and through its agents and employees, illegally retaliated against Plaintiff by unjustly neglecting to protect her from a hostile work environment that was caused by and created by two male employees solely because she had complained of and reported the aforementioned sex discrimination. Defendant had no legitimate reasons for any such act. Said act of retaliation is in violation of Title VII of the Civil Rights Act of 1964.

166. As herein alleged, Defendant, by and through its agents and employees, illegally retaliated against Plaintiff by unjustly subjecting her to a false allegation of workplace violence which led to her unjust suspension, and subsequent unjust termination solely because she had complained of and reported the aforementioned sex discrimination. Defendant had no legitimate reasons for any such act. Said act of retaliation is in violation of Title VII of the Civil Rights Act of 1964.

167. As a proximate result of Defendant's unlawful retaliatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

168. Defendant's unlawful retaliatory actions were intentional, willful, malicious, and/or done with reckless disregard for Plaintiff's rights.

169. Plaintiff requests relief as described in the Prayer for Relief below.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court:

1. Enter a declaratory judgment that the practices complained of in this complaint are unlawful and violate Title VII of the Civil Rights Act of 1964;

2. Grant all injunctive relief necessary to bring Defendant into compliance with the aforementioned laws;

3. Order Defendant to pay the wages, salary, employment benefits, and other compensation denied or lost to Plaintiff to date by reason of Defendant's unlawful actions, in amounts to be proven at trial;

4. Order Defendant to pay compensatory damages for Plaintiff's humiliation, emotional distress, and other damages caused by Defendant's conduct, in an amount to be proven at trial;

5. Order Defendant to pay exemplary and punitive damages;

6. Order Defendant to pay expenses and cost of the action;

7. Order Defendant to pay interest at the legal rate on such damages as appropriate, including pre – and post-judgment interest; and

8. Grant any further relief that the Court deems just and proper.


Dated:  May 17, 2016                    Respectfully submitted,

_Tawana Jean Cooper 5·17·2016_

Tawana Jean Cooper, Plaintiff/Pro Se
6920 Braddock Road, #B175
Annandale, Virginia 22003
(571) 419-8454  coopertj@ymail.com


## STATEMENT OF VERIFICATION

I have read the above complaint and it is correct to the best of my knowledge.

_Tawana Jean Cooper 5·17·2016_

- 17 -

Tawana Jean Cooper, Plaintiff/Pro Se
6920 Braddock Road, #B175
Annandale, Virginia 22003
(571) 419-8454  coopertj@ymail.com

## CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared, or assisted in the preparation of this document.

Name of *Pro Se* Party (Print or Type)

Signature of *Pro Se* Party

Executed on : 5·17·2016 (Date)

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: May 17, 2016                    Respectfully submitted,

Tawana Jean Cooper, Plaintiff/Pro Se
6920 Braddock Road, #B175
Annandale, Virginia 22003
(571) 419-8454  coopertj@ymail.com